**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**JAMES SANDERS** **PLAINTIFF**

**v.** **NO. 4:26-cv-00033-LPR-PSH**

**FRANK J. BISIGNANO, Commissioner of the Social Security Administration** **DEFENDANT**

# FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following Recommendation has been sent to United States District Judge Lee P. Rudofsky. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

DISPOSITION

Plaintiff James Sanders ("Sanders") challenges the denial of his application for Title XVI supplemental security income payments. He does so on the following three grounds: (1) his residual functional capacity was erroneously assessed because his subjective complaints were not properly evaluated pursuant to the governing regulation; (2) his residual functional capacity was erroneously assessed because the limitations caused by his left knee impairment were not properly evaluated; and (3) the Administrative Law Judge ("ALJ") erred at step five of the sequential evaluation process by relying upon a vocational expert's answer to a hypothetical question based on an erroneous assessment of Sanders' residual functional capacity. Substantial evidence on the record as a whole supports the ALJ's decision, and he committed no legal error.[1] It is therefore recommended that the ALJ's decision be affirmed and this case be dismissed.

[1] The question is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support the [ALJ's] conclusion." See Id. "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." See Lucus v. Saul, 960 F.3d 1066, 1068 (8th Cir. 2020) (quoting Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted)).

The ALJ uses a sequential evaluation process for determining if a claimant is disabled for purposes of the Social Security Act. One part of the process requires the ALJ to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite his limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). At step five of the process, the ALJ determines if the claimant is able to do any work when considering, inter alia, his residual functional capacity. See Crawford v. Colvin, 809 F.3d 404 (8th Cir. 2015).

This case centers on the assessment of Sanders' residual functional capacity. In the ALJ's decision, he summarized the evidence relevant to that assessment. See Transcript at 19-23. There is no dispute about the evidence; the only dispute involves the conclusions to be drawn from the evidence. There is no need to reproduce in full the ALJ's summary of the evidence. Some of it, though, will be reproduced in order to place Sanders' assertions of error in an historical context.

Sanders was born on May 30, 1980, and was forty-three years old on the day he filed his application, August 10, 2023. In the application, he alleged that he became disabled on January 1, 2019, because of impairments that include a left knee impairment. See Transcript at 244. He later maintained that he is also unable to work because of back pain.

The medical evidence in the record appears to go back as far as 2018. It reflects that between 2018 and 2022, Sanders occasionally sought medical attention for knee pain that appears to have been initially caused by an injury he sustained in a motor vehicle accident. See, e.g., Transcript at 382-283 (09/11/2018); 361-362 (01/08/2019); 359-361 (03/18/2019); 358-359 (08/07/2019); 347-349 (12/04/2019); 525-526, 1150-1151 (09/24/2020), 514 (09/01/2021), 512 (12/22/2021).[2] He was treated with prescription medication that included acetaminophen-codeine and, later, buprenorphine. His symptoms were typically well-controlled, and he routinely exhibited a normal range of motion with no observable signs of tenderness or edema.

On January 25, 2021, Sanders underwent MRI testing of his left knee. The results revealed a radial tear in his medial meniscus, medial compartment osteoarthritis, a small joint effusion, and minimal cartilage fraying. See Transcript at 406-407. Arthroscopic surgery was performed later that year. See Transcript at 639. The extent to which the surgery alleviated his pain is not clear.

[2] The bulk of the medical records from the period between 2018 and 2022 appear to primarily involve Sanders' other impairments and/or his requests for medication refills. Those records nevertheless reflect that he was repeatedly assessed with left knee pain, as well as back pain.

On December 23, 2022, Sanders sought emergency room care for a medical condition unrelated to his knees or back. See Transcript at 464-476. The results of a physical examination were unremarkable. His extremities exhibited a normal range of motion and an inspection of his back was normal, although he had an abnormal gait.

Sanders also sought medical attention during the period between 2018 and 2022 for back pain, which later medical records characterized as, among things, lumbosacral radiculopathy. See, e.g., Transcript at 1440. Although the relevant medical records from the period are not extensive, they indicate that he was treated with prescription medication that included gabapentin. See, e.g., Transcript at 1440.

Beginning in 2023 and continuing into 2024, Sanders sought greater medical attention for his knee and back issues. The ALJ's unrebutted summary of the evidence during the period is as follows:

> In 2023, ... Sanders appears to have experienced an exacerbation of symptoms, or his treatment provider highlighted or noted more clinical deficits during his presentations to the office. During the first half of 2023, he appeared comfortable (Exhibits: 8F, page 55; 13F, page 61; 19F, page 77). However, by the fall, upon physical examination, he exhibited a range of deficits, including the following: a slow and antalgic gait; poor posture; spasms, tenderness and pain on palpation, and decreased and painful range of motion involving his lumbar spinal region; decreased lumbar lordosis; midline

tenderness in his spinal and paraspinal regions; palpable taut bands or trigger points in his lumbosacral paraspinal region; low back and hip pain on palpation of his bilateral sacroiliac joints and trochanteric bursa area; and positive Patrick's, Gaenslen's, and ASIS compression signs (Exhibits: 6F, pages 15-16; 13F, pages 23-24; 19F, pages 35-37; 25F, page 55). Nevertheless, his strength appeared to remain intact (See Exhibits: 13F, page 49). He remained on narcotic pain medication, nerve pain medication, and an anti-inflammatory topical gel (Exhibit 6F, page 16).

During the remainder of 2023, ... Sanders continued to experience significant symptoms. He regularly complained of chronic knee pain, chronic mid-back (thoracic) pain, and chronic low back pain (Exhibit 14F, page 8). He continued to show signs of clinical abnormalities upon physical examination. These included decreased and painful range of motion in his lumbosacral region, tenderness in his sacrum and sciatic nerve, positive Patrick's and Gaenslen's signs, an antalgic and slow gait, poor posture, and tenderness and pain on palpation of his left knee, in addition to other deficits he had previously exhibited in the fall (Exhibit 14F, pages 12, 22). Additionally, a November 2023 MRI study of [his] lumbar spine revealed a bilateral foraminal and extraforaminal broad-based disc osteophyte, and mild neural foraminal narrowing (Exhibits: 10F, pages 32-34; 19F, page 6). However, during other physical examinations performed around the same time, he demonstrated normal muscle strength (and sometimes, a normal gait) (Exhibits: 12F, page 12; 13F, pages 36-37; 23F, pages 16-18). Further, in addition to pharmacological treatment, ... [he] began undergoing rehabilitative therapy for his back pain (Exhibits: 10F, pages 5-27; 11F, pages 5-27).

In 2024, ... Sanders['] physical condition remained fairly unchanged. During the first half of 2024, he continued to exhibit the same or similar clinical deficits he exhibited in 2023 (See Exhibits: 14F, page 29; 20F, pages 10, 22, 60). Nevertheless, he did not require an assistive device (and sometimes he even demonstrated a normal gait). During that

> same period, he began undergoing lumbar medial branch block procedures; however, his level of impairment appeared unchanged (Exhibit 20F, pages 44, 51). He also continued to undergo pharmacological treatment (Exhibits: 14F, page 30; 20F, pages 11, 61; 25F, pages 18, 27). However, at least through the summer of 2024, his deficits remained largely unchanged (Exhibit 25F, page 11). That same summer, [he] underwent a lumbar radiofrequency ablation (Exhibits: 25F, page 1; 26F, page 14). Finally, he had a "positive response" with more than 80% pain relief (Exhibit 25F, page 4). That fall, his strength, sensation, and gait appeared unremarkable (Exhibit 26F, pages 4, 9).

See Transcript at 20-21.

On September 17, 2023, and again on May 14, 2024, Sanders completed function reports in support of his application. See Transcript at 261-268, 288-295. In the reports, he represented that his knee and back problems limit his ability to stand and walk and require him to devote more time than usual to his basic self-care. Although he can prepare simple meals, the performance of basic household chores takes longer than normally required. He cannot perform routine yard work. He can only lift about ten pounds. He can only walk about fifty to two hundred feet before he must stop and rest, and he must wait about fifteen to twenty minutes before he can begin walking again. He was prescribed a knee brace in 2020 to help him walk, and he uses the brace "daily" or "all the time." See Transcript at 267, 294.

Sander testified during the January 27, 2025, administrative hearing. See Transcript at 36-50. He is six feet, one inches tall and weighs 312 pounds. He cannot work because of the constant pain in his left knee, a sharp pain that makes his knee unstable. He has received multiple injections in his knee that have provided some relief, but the relief has only been temporary. He wears a brace on his knee and sometimes additionally uses a stick or cane to help him walk. His knee problems occasionally cause him to fall, and he fell five times in the two months period prior to the hearing.

Sanders also cannot work because of the constant pain in his back, describing the pain as a constant, sharp pain. He has received multiple injections in his back that have provided some relief from his pain, but the relief has only been temporary. He takes hydrocodone three times daily for his pain, and it causes him to become drowsy.

Sanders can only walk about one hundred feet before he must stop to rest. He must sometimes "lay back and elevate [his] feet" because they occasionally begin to swell after he walks." See Transcript at 43. He can only stand for about ten to fifteen minutes before he begins to experience pain. He spends a "good part" of his day in a reclining position in an attempt to relieve the pain in his knee and back. See Transcript at 44.

A vocational expert also testified during the administrative hearing. See Transcript at 50-53. The ALJ posed a series of hypothetical questions to the vocational expert, one in which a hypothetical individual was identified who possessed, inter alia, Sanders' residual functional capacity and was capable of performing a reduced range of light work. The vocational expert testified that the hypothetical individual would be able to perform the requirements of three jobs, those being, a housekeeper, inspector/packer, or routing clerk.

The ALJ found at step two that Sanders' severe impairments include a disorder of the spine, osteoarthritis, and obesity. The ALJ assessed Sanders' residual functional capacity and found that he is capable of light work with the following additional physical limitation: "[he] can engage in only occasional stooping and crouching." See Transcript at 18. In making the assessment, the ALJ found that although Sanders' impairments could reasonably be expected to produce pain or other symptoms, the intensity, persistence, and limiting effects of the symptoms would not prevent him from performing a reduced range of light work. At step five, the ALJ relied upon the vocational expert's answer to the hypothetical question noted above and found that there is other work in the national economy that Sanders can perform.

Sanders maintains that his residual functional capacity was erroneously assessed and offers two reasons why. First, he maintains that his subjective complaints were not properly evaluated pursuant to the governing regulation, which in this case is 20 C.F.R. 416.929.[3]

In assessing the claimant's residual functional capacity, the ALJ must evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ does so by determining whether the claimant has a medically determinable impairment that could reasonably be expected to produce pain or other symptoms and, if so, evaluating the intensity, persistence, and limiting effects of the pain or other symptoms. In doing so, the ALJ must consider all the evidence in the record, including evidence of the following:

> (i) ... daily activities; (ii) [t]he location, duration, frequency, and intensity of ... pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or [has] taken to alleviate ... pain or other symptoms; (v) [t]reatment, other than medication, [the claimant] receive[s] or [has] received for relief of ... pain or other symptoms; (vi) [a]ny measures [the claimant] use[s] or [has] used to relieve ... pain or other symptoms ...; and (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

[3] Sanders maintains that the governing regulation is 20 C.F.R. 404.1529, but that regulation applies to Title II disability claims. This case involves a claim for Title XVI supplemental security income payments and is therefore governed by 20 C.F.R. 416.929. It ultimately makes no difference, though, because the rules for evaluating pain and other symptoms under the two regulations are identical.

See 20 C.F.R. 416.929. See also Social Security Ruling 16-3p; Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

In evaluating Sanders' subjective complaints, the ALJ noted his obligation to comply with 20 C.F.R. 416.929. The ALJ recounted Sanders' allegations with respect to his symptoms and limitations, summarizing his testimony during the administrative hearing. The ALJ found that although Sanders' medically determinable impairments could reasonably be expected to cause the alleged symptoms, "his statements concerning the intensity, persistence, and limiting effects of [the] symptoms are not entirely consistent with the medical evidence in the record." See Transcript at 19. The ALJ could find as he did with respect to the medical evidence, as his evaluation of it is supported by substantial evidence on the record as a whole. What, though, of the non-medical evidence in the record; specifically, are Sanders' statements concerning the intensity, persistence, and limiting effects of his symptoms consistent with the non-medical evidence in the record? Although the ALJ's evaluation of the non-medical evidence is certainly not a textbook example of such an evaluation, it was adequate and is supported by substantial evidence on the record as a whole. The undersigned so finds for the following reasons.

First, the ALJ briefly considered Sanders' daily activities, albeit in the context of the step three analysis. See Transcript at 17-18. The ALJ noted that Sanders is capable of, inter alia, attending to his personal care, preparing simple meals, driving an automobile, using public transportation, and shopping in stores.

Second, the ALJ briefly considered the location and intensity of Sanders' pain, as well as precipitating and aggravating factors. See Transcript at 19. The ALJ noted that Sanders experiences pain in his left knee and reported significant limitations in standing and walking. The ALJ could and did observe, though, that Sanders nevertheless regularly demonstrated "an unassisted (albeit, sometimes abnormal) gait and normal muscle strength." See Transcript at 22. Sanders sometimes elevates his feet, which helps alleviate the swelling in them. The ALJ could and did observe, though, that Sanders has "generally shown no signs of edema or swelling." See Transcript at 22.

Third, the ALJ briefly considered the type, effectiveness, and side effects of Sanders' medication and other treatment and measures he uses, or has used, to help alleviate his pain. See Transcript at 19-20. The ALJ noted that Sanders takes, or has taken, narcotic pain medication and used an anti-inflammatory gel for his knee pain. Although the medication causes

insomnia, the ALJ could and did observe that Sanders did not seek a "medication adjustment as a result." See Transcript at 22. For back pain, Sanders takes, or has taken, "narcotic pain medication and nerve pain medication," see Transcript at 20, and undergone lumbar radiofrequency ablation, lumbar medial branch blocks, and rehabilitative therapy.

Fourth, the ALJ also briefly considered other measures Sanders uses, or has used, to relieve his pain and other symptoms. For instance, the ALJ noted that Sanders sometimes uses a walking stick for ambulation. See Transcript at 19.

The question for the ALJ was not whether Sanders has pain, but the extent to which his pain impacts the most he can do. The ALJ incorporated limitations for Sanders' pain into the assessment of his residual functional capacity but not to the extent he believes is warranted. The ALJ could find as he did, though, as substantial evidence on the record as a whole supports his evaluation of both the medical and non-medical evidence.

Sanders offers a second reason why his residual functional capacity was erroneously assessed. He maintains that the limitations caused by his left knee impairment were not properly evaluated. It is his contention that given his left knee pain, he cannot perform the standing or walking requirements of a reduced range of light work.

The ALJ found that Sanders can perform a reduced range of light work, reduced because he can engage in only occasional stooping and crouching. Light work requires a good deal of standing or walking. See 20 C.F.R. 416.967(b). In Frankl v. Shalala, 47 F.3d 935 (8th Cir. 1995), the Court of Appeals observed that light work requires a claimant to be capable of standing or walking for a total of six hours in an eight-hour workday.

Sanders' assertion of error warrants no relief. The ALJ could find as he did, as substantial evidence on the record as a whole supports his finding. The undersigned so finds for the following reasons.

First, the ALJ adequately considered the medical evidence relevant to Sanders' left knee impairment. The ALJ considered that although Sanders had pain and oftentimes an abnormal gait, he typically had normal muscle strength, a normal range of motion, and no evidence of tenderness, edema, or swelling. The ALJ also considered the treatment Sanders received for his pain, treatment in the form of, inter alia, narcotic pain medication and an anti-inflammatory gel. Additionally, the ALJ could find persuasive, and rely upon, the prior administrative medical findings of the state agency medical consultants, both of whom opined that Sanders can perform work at the light level of exertion with the postural limitations identified by the ALJ. See Transcript at 23, 94-95, 105-106.

Second, the ALJ adequately considered the non-medical evidence relevant to Sander's left knee impairment. The undersigned will not repeat the analysis of the ALJ's evaluation of the non-medical evidence. It is enough to note that the ALJ briefly considered such things as Sanders' daily activities; the location and intensity of his pain; the type, effectiveness, and side effects of his medication and other treatment and measures he uses, or has used, to help alleviate his pain; and other measures he uses, or has used, to relieve his pain and other symptoms.

"It is not the role of the court to re-weigh the evidence and, even if [the undersigned] would decide the case differently, it cannot reverse the [ALJ's] decision if that decision is supported by good reason and is based on substantial evidence." See Dillon v. Colvin, 210 F.Supp.3d 1198, 1201 (D.S.D. 2016). In fact, the undersigned may not reverse the ALJ's decision merely because substantial evidence supports an opposite decision. See Id.

Here, the undersigned is being asked to re-weigh the evidence and reach a conclusion different than that reached by the ALJ. Were the undersigned tasked with assessing Sanders' residual functional capacity in the first instance, the undersigned might have reached a different conclusion. That task, though, is not for the undersigned, and substantial evidence on the record as a whole supports the ALJ's assessment.

Sanders offers a third reason why the ALJ's decision is not supported by substantial evidence on the record as a whole. Sanders maintains that the ALJ erred at step five by relying upon a vocational expert's answer to a hypothetical question based on an erroneous assessment of Sanders' residual functional capacity. It is Sanders' contention that the question did not fully account for the limitations caused by his left knee impairment.

Testimony from a vocational expert is substantial evidence on the record as a whole only when "the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." See Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997). The question must include all of the claimant's impairments that are substantially supported by the record as a whole. See Id.

Here, the ALJ did not err in crafting the hypothetical question or in relying upon the vocational expert's answer. The question captured the concrete consequences of the limitations caused by Sanders' left knee impairment. It is true that the question did not incorporate limitations for a severe restriction in his ability to stand and walk, but the ALJ's failure to do so does not warrant a remand. Substantial evidence on the record as a whole supports the ALJ's determination that Sanders can stand or walk for up to six hours in an eight hour workday.

It is for the foregoing reasons that substantial evidence on the record as a whole supports the ALJ's findings, and he committed no legal error. The undersigned therefore recommends that the ALJ's decision be affirmed. Sanders' complaint should be dismissed, all requested relief should be denied, and judgment should be entered for the Commissioner.

DATED this 5th day of October, 2026.

UNITED STATES MAGISTRATE JUDGE